**E-FILED**
Monday, 18 August, 2008  04:53:55 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBERT F. RUSSO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.  08-3014 |
| | ) | |
| DONALD A. HULICK, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Petitioner Robert F. Russo's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (d/e 1-2) (Petition).  Russo also has filed a Motion for Production of Pre-Trial Discovery Documents (d/e 4) and a Motion for De Novo Review (d/e 12).  For the reasons stated below, the Court finds a hearing unnecessary and denies all three.

## FACTS

Petitioner currently is incarcerated at the Illinois Department of Corrections Menard Correctional Center, where he is serving a sixty-year sentence on a conviction for first-degree murder.  On August 17, 2001, a

jury in the Circuit Court of Adams County, Illinois convicted him of murdering Francis Dale Smith, who had killed the brother of one of Petitioner's neighbors.

I.   THE EVIDENCE

In March of 2001, Petitioner lived with his wife Mary Russo in an apartment complex in Quincy, Illinois. Jerome Shoop and Chuck Conover, Sr. lived together in another unit within the same complex. Conover, Sr. and Mary Russo were involved in a romantic affair. According to Shoop, twenty years earlier, Smith killed Shoop's brother in an incident at a bar.

Numerous witnesses testified at trial that on the night of March 11, 2001, Petitioner and Smith drank together at Tom & Jerry's bar. Shoop testified that around 5:00 p.m., Petitioner came by his apartment and stated that he "needed to go back up to the bar" because "that f'in Smith was up there." Respondent's Response (d/e 15) (Response), Exhibit I, Trial Transcript, at 49.

Petitioner's wife, Mary Russo, testified that evening, she had drinks with a Margaret Sharrow and then went over to Shoop and Conover, Sr.'s apartment. She was there around 8:00 p.m. when Petitioner came to the door and asked her to "turn a trick for him." Id. at 233. She testified that

as she was leaving, she told Donna Heather, another woman in the apartment, that if she did not come back within an hour, Donna Heather should call the police.  Contradicting Mary Russo's testimony, Margaret Sharrow denied having drinks with Mary Russo that night, and Donna Heather testified that, while Mary Russo left with Petitioner from Shoop and Conover Sr.'s apartment, Mary Russo never warned her to call the police.

According to Mary Russo, after leaving the apartment, she and Petitioner walked to Tom & Jerry's where Petitioner wanted her to draw Smith out of the tavern so that he could kill Smith.  Petitioner told her that Smith had killed Shoop's brother, and Shoop had offered Petitioner $500.00 to murder Smith.  Mary Russo saw a meat cleaver in Petitioner's back pocket.  Yet, in a recorded conversation between Mary Russo and Petitioner's investigator, which Petitioner introduced at trial, Mary Russo wavered on whether Petitioner told her on the way to the bar that he intended to kill Smith.

At the bar, Smith agreed to pay Mary Russo for oral sex, and while he suggested the parking lot, she opted for the men's bathroom.  Mary Russo performed the sexual favor, but, after a dispute about the money, Petitioner

intervened.  According to Mary Russo, the two men went to the bar, and she returned to Shoop and Conover Sr.'s apartment.  She testified that around 9:15 or 9:30 p.m., Petitioner arrived, and she had a conversation with him. Conover, Sr. was out initially, but he then returned, and Petitioner offered him $50.00 to move Smith's body.  Mary Russo testified that Conover, Sr. refused.

According to Shoop, around 10:30 p.m. Petitioner came by his apartment and said that Smith was dead in Petitioner's apartment, on his couch, and he needed Shoop's help.  Shoop refused; and Shoop then went to pick up Conover, Sr. at a nearby complex.  Conover, Sr. testified that during the car ride home, Shoop told him that Petitioner had just said he'd killed a man and asked to use Shoop's car to get rid of the body.  When they returned, Shoop and Conover, Sr. observed Petitioner moving a love seat out the front door of his apartment.

Around 11:00 p.m., Shoop testified, Petitioner again came by Shoop's apartment and asked to borrow his car and handsaw.  Shoop said he refused.  Petitioner asked Conover, Sr. to help him carry the body to the ravine, but Conover, Sr. indicated that he also refused.  According to Conover, Sr., Petitioner told him later that night that he "lightened it up by

4

taking care of it." Response, Exhibit K, Trial Transcript, at 167.

Three days later, Shoop told a friend, Kim Gooding, of Petitioner's actions. Gooding testified regarding this conversation and indicated that Shoop was "shaken up" when he told her.   Response, Exhibit I, Trial Transcript, at 140.   Gooding reported the conversation to her mother, Lenora Hogan, who testified to her daughter's account.

Petitioner testified at trial.  He stated that he was with Smith the night of March 11, 2001, until they arrived at the Sandbar Tavern.  There, Smith told Petitioner that Mary Russo had tried to solicit a later rendezvous with him at their apartment.  Petitioner left angry.  He testified that he went to Conover, Sr.'s apartment and argued with Mary Russo.  He then left the apartment and went to the Wand-R-Inn tavern, but "places and faces start to get a little hazy" after that.   Response, Exhibit M, Trial Transcript, at 108.  He did remember stopping at two more bars.

Petitioner told the jury that after the bars closed, he looked for a place to stay and ended up in a hotel for the night.  At 6:00 a.m., he returned to his apartment to retrieve a suitcase.  He found his couch and two lamps missing.  He then began hitchhiking and ended up at a Salvation Army shelter in St. Louis.

On March 17, 2001, police found Smith's body in a grassy area near the apartment complex. Smith's body had deep lacerations in the scalp and a massive cut across the neck, and someone had chopped off portions of his arms and legs. Investigators found a small saw under Petitioner's bed and a "claw type hammer" in an adjacent toolbox. Response, Exhibit K, Trial Transcript, at 150. Expert witnesses testified that these tools could have caused Smith's wounds, but forensic analysis failed to discover any blood on them.

Near a dumpster at the apartment complex, police also found a sofa stained with blood. Marlon Tournear, a neighbor across the street, testified that on the evening of March 11, 2001, he saw a man "flip the couch out" of Petitioner's apartment and sweep and mop Petitioner's apartment floor and the sidewalk outside it. Response, Exhibit H, Trial Transcript, at 129. Tournear identified the man he saw as Terry Hawe. Tournear testified that after he witnessed the man flip the couch out of the apartment and clean the floors, his wife arrived home from work. His wife testified that from the same vantage point, she later observed Petitioner and another man carry the couch away from the apartment, and the other man then carried lamps

away.[1]   Petitioner called Hawe to testify, but Hawe invoked his Fifth Amendment right and answered no questions.  DNA analysis determined that the blood on the couch near the dumpster and the blood found on the walls of Petitioner's apartment were both Smith's.

Petitioner testified that while in St. Louis, he saw a news report indicating he was wanted for murder in Quincy.  He then wandered around for a few hours and threw away his luggage and identification to "perhaps become a different person."  Response, Exhibit M, Trial Transcript, at 130.  Eventually, he called 911 and surrendered to authorities.

Investigator Randy Strode investigated Smith's murder and interviewed Petitioner on March 20, 2001.  He testified that Petitioner told him he had gone to the Branding Iron to drink on March 11, 2001.  Later Petitioner, Smith, and a third man went to Tom & Jerry's, but Petitioner walked on to a third bar, Sandbar Tavern, alone.  Petitioner told Strode that he stayed there for an hour and then walked home by himself.  At home, he packed a suitcase so that he could leave Quincy to escape traffic citations.  He spent the rest of that night and the next at a hotel.  Strode testified that

---

[1]Petitioner argues that the Tournear had been drinking that night, but the Court can find no evidence in the record supporting his contention.

Petitioner did not remember taking Mary Russo to Tom & Jerry's and had no memory of any conversation with Conover, Sr. the night of March 11, 2001. Petitioner told Strode he did not remember leaving Tom & Jerry's in a cab with Smith, but if others said he did, it was possible. He could not remember where he and Smith were when they parted company. Petitioner was adamant, however, that Smith had never been to his apartment that evening.

II.   LEGAL ISSUES

In addition to the evidence, a number of court rulings and prosecutorial actions are at issue here. Two arose before trial, and several during trial.

A.   Pre-Trial

1.   Judge Substitution

Before Petitioner's trial, his wife Mary Russo was involved in an unrelated probation revocation hearing. Petitioner's trial judge, the Honorable Dennis K. Cashman, presided over Mary Russo's revocation proceeding. During that hearing, he admonished her to "testify truthfully" at Petitioner's trial. Response, Exhibit C, Common Law Record, at 2 (C34). Her sentencing order stated that "any jail time may be waived if a bed

becomes available at a treatment center after her testimony is completed with Mr. Russo's murder trial."  Id. at 2 (C34).  On this basis, Petitioner argued that Judge Cashman was prejudiced against him and filed a motion to substitute judge.

The Honorable Scott H. Walden was assigned to hear Petitioner's motion for substitution.  Judge Cashman submitted an affidavit to Judge Walden stating that he ordered Mary Russo to testify truthfully in Petitioner's trial only to make certain that she understood her obligation to be truthful.  Additionally, he noted that the language suggesting a jail waiver after testimony was erroneously included in her sentencing order.  Judge Cashman believed that Mary Russo's defense attorney inserted the language, and he indicated that on the same date he submitted this affidavit, he revised the sentencing order to exclude such language.  Finally, Judge Cashman stated that in his 22 years as a judge, he always ordered defendants to testify truthfully but never intended to prompt a defendant to testify for one party over another.

Judge Walden denied Petitioner's motion to substitute.  He noted that advising a witness to testify truthfully is no different than advising the witness not to perjure herself, which would be prohibited under standard

terms of probation.  All proceedings on Petitioner's motion to substitute occurred before the start of Petitioner's trial, and thus before Mary Russo testified.

### 2.   Marital Privilege

In another pretrial motion regarding Petitioner's wife, Petitioner sought to bar Mary Russo's testimony under Illinois' marital privilege law. Mary Russo was expected to testify to three conversations she says she had with Petitioner: the conversation at Shoop and Conover, Sr.'s apartment before the couple headed to Tom & Jerry's, the conversation with Petitioner on the way to Tom & Jerry's, and a conversation later that night in which she says Petitioner admitted to murdering Smith.

The court granted the motion in part and denied it in part.  The court held that the third conversation was privileged, but the first two fell within Illinois' agency exception to the marital privilege law because they involved one spouse asking the other to perform an act in furtherance of a crime. The judge noted that in his opinion, the third conversation should not be privileged because "nobody should be able to hide behind a so-called sanctity of a marriage when dastardly deeds are being discussed, and talked about and performed." Response, Exhibit F, Hearing Transcript, at 33.

Nonetheless, he stated, existing law held that the privilege applied to this conversation, so he would apply the law and exclude the conversation.

B.    Trial

        1.    Adam Heather's Statements

On the third day of trial, October 11, 2001, a man named Adam Heather appeared at the State's Attorney's Office.  The next morning, attorneys for both the State and Petitioner informed the court that the day before, Adam Heather discussed with them conversations he had with Chuck Conover, Jr. (Chuck Conover, Sr.'s son) regarding Smith's murder. Adam Heather had never before contacted investigators in this case, and the State stressed that, even in his statements the previous evening, he had provided widely varying accounts of the conversations he claimed to have had with Conover, Jr.

In the presence of Petitioner's counsel, Adam Heather stated that he and his wife, Bobbi Jo Heather, visited Conover, Sr.'s apartment either March 11, 2001, or sometime in May 2001, to purchase marijuana.  A man named Lucas Roberts was also at the apartment.  Conover, Sr. and Conover, Jr. told Adam Heather that they were involved in the cleanup of Petitioner's apartment on March 11, 2001, and they moved out a couch.  They told

Adam Heather that Shoop struck Smith in the head with a statue, and Petitioner cut off Smith's arms and legs.

Also in the presence of Petitioner's counsel, Adam Heather stated that on another occasion, he was in the car with Conover, Jr., and Conover, Jr. said that he had been involved in the cleanup of Petitioner's apartment after Shoop struck Smith on the head with a statue.  Adam Heather told the parties that he was under the influence of drugs during this conversation.

Additionally, at some point earlier in the day while he was talking with State authorities, Adam Heather said that the Conovers told him that Petitioner had lured Smith back to Petitioner's apartment to be killed. Petitioner's counsel told the court that in his presence, Adam Heather never mentioned Petitioner luring Smith back to his apartment.  Petitioner's counsel asked Adam Heather about Petitioner's involvement, and Adam stated only that he was told Petitioner cut off Smith's arms and legs with a saw.

Petitioner's counsel sought to elicit Adam Heather's testimony to impeach Conover Sr.'s.  On the morning of the fourth day of trial, the court ordered subpoenas for the Heathers.  Investigators, however, could not locate them.  Adam  Heather called the prosecutor to complain that he had

12

appeared in the news.

Before the trial concluded, the court allowed an offer of proof outside the presence of the jury. Lucas Roberts, who allegedly witnessed Adam Heather's conversation with the Conovers in mid-May 2001, testified that he drove the Heathers to Conover, Sr.'s apartment to purchase marijuana. He said he sat on the couch while Adam Heather and Conover, Sr. discussed tattoos about ten feet away. He did not overhear any discussion of murder and testified that he would have paid attention to such a discussion if he had. Adam Heather did not mention such a discussion during the 30-minute car ride back from Conover, Sr.'s apartment, and he did not appear distressed.

Conover, Jr. also testified that he never had any conversation with Adam Heather regarding Smith's death. He said he had no personal knowledge regarding Smith's death, and no one ever admitted anything to him regarding it.

On the trial's sixth day, Petitioner requested a continuance until the Heathers could be located. The court denied his request, noting that such a continuance could be indefinite. The court stated:

A case of this magnitude is not going to rise or fall on somebody

taking it upon themselves to walk into the State's Attorney office in the middle of a trial when they made no effort to disclose this information before then, to give then [sic] a version of something, and change that version along the way and avoid service of process, and cause this case to come to a grinding, screeching halt.

Respondent's Response, Exhibit L, Trial Transcript, at 265-66.

Before Petitioner rested, he renewed his motion to continue, but conceded that the Heathers could not be considered material witnesses and that state investigators had attempted to serve subpoenas on them for six days. The court denied the motion, again noting that the continuance could be indefinite. The court also stated that two people allegedly present for the conversation denied that it occurred, and there was no way to predict what the Heathers would say if they testified.

On May 17, 2002, after Petitioner's trial, a private investigator working for Petitioner taped an interview with Adam Heather. Petitioner provided the Court a transcript of this unsworn interview. In the interview, Adam Heather stated that the year before, a day or two after Smith was murdered, Conover, Jr. drove him to Quincy to perform tattoo work. During the trip, Conover, Jr. told him that Shoop hit Smith over the head with a statue, and Conover, Jr. and Conover, Sr. helped clean blood from

the apartment and moved a couch out of it.  Conover, Jr. bragged that he

was present during the murder, but Adam Heather understood that he only

assisted in the clean-up.  Conover, Jr. told him that only he, Conover, Sr.,

Shoop, and Smith were present during the murder, but Conover, Jr. left at

some point and later returned to clean up.  Conover, Jr. also told him that

Petitioner dismembered the body with a hacksaw.  Adam Heather told the

investigator that after he came by the State's Attorney's Office to discuss

the murder during the trial, he received a telephone death threat.  Adam

Heather refused to provide a sworn statement but said that he would share

this same story again informally.

>    2.   DNA Evidence

DNA expert Aaron Small testified at trial.  In discussing the results of

testing the blood samples retrieved from Petitioner's apartment walls, the

couch found outside, and a matching couch cushion discovered at a landfill,

Small introduced a chart.  When he identified columns on the chart, he

stated that one related to a bloodstain found on Terry Hawe's pants.  He

testified that the blood in this stain was Hawe's.  Petitioner did not object

to this testimony or the chart.

At a sidebar, however, the court *sua sponte* expressed concern over the

lack of a foundation establishing that the pants referenced were Hawe's or that he wore them the night of Smith's murder.  The court described the testimony as "irrelevant" and worried that the jury might conclude that because only Hawe's own blood was found on the jeans, Hawe was not involved in Smith's murder.  The court ordered the State to clarify the evidence, and the State elicited testimony from Investigator Strode indicating that Strode seized the pants only because they were stained, and he had no information regarding whether Hawe wore those pants the night of Smith's murder.

       3.   <u>Closing Argument</u>

During closing arguments, the State made several comments at issue here.  First, during the opening segment of his closing argument, the prosecutor accused Petitioner of lying.  He stated:

> One of the things I think we all know from our experience in life, whatever those experiences might be, wherever we have been, is that we have probably all seen, heard, endured liars, and one of the things that we know from that experience is that one of the -- one of the favorite techniques of liars is to add detail to their stories, spice it up with a few facts, because it makes it sound credible, makes it sound believable.  Boy, he remembers this, and he remembers this and he remembers this.  The good ones, the accomplished liars, will do that. . . .  And what he did yesterday morning and attempted to do yesterday afternoon in what I can most charitably describe as one pathetic attempt to

16

explain his lies to Randy Strode was simply one more gigantic lie to you folks.

Response, Exhibit N, Trial Transcript, at 60-61.  Additionally, the State discussed an accountability theory of guilt.  The prosecutor told the jury that even if others were involved in this crime, Petitioner could still be guilty beyond a reasonable doubt.  He explained:

> What His Honor is going to tell you is that there is a principle of law known as accountability.  "Accountability" means, for our purposes, that Robert Frank Russo need not have been the person who wielded whatever weapon it was that crushed the skull of Dale Smith, that he need not have been the person who cut him up.  As we already know from the uncontradicted evidence from him luring him down there and then disposing of all of the evidence, if he was merely part of a plan of other people with other people acting in concert with them to plan and execute the murder of Dale Smith -- no pun intended -- then he is, under the law, guilty of murder. . . .   The uncontradicted evidence beyond any doubt indicates that Robert Russo planned alone or with others and executed alone or with others the death of Dale Smith.

Id. at 75-77.  The prosecutor also described Petitioner as a butcher during closing argument, stating, "Robert Frank Russo is a butcher of the truth, Robert Frank Russo is a butcher of a human being . . . ."  Id. at 81.  Finally, the State concluded its rebuttal argument by stating:

> Ladies and gentlemen, you speak for the people of this community.  You will decide what is right, you will decide what is just in this case, and there are only two things that stand

between the killer among us walking out of this room:  The
evidence and the jury.  And I'm asking you to make the decision
that the evidence compels you to make, the decision, the verdict
of guilty.

Id., at 101.

### 4.   Instructions

After closing arguments, the court read instructions to the jury,

including two instructions at issue here.  First, the court informed the jury

that "[t]he believability of a witness may be challenged by evidence that on

some former occasion he made a statement or acted in a manner that was

not consistent with his testimony in this case," and such evidence "may be

considered by you only for the limited purpose of deciding the weight to be

given to the testimony you heard from the witness in this courtroom."  Id.,

at 106-07.  Second, the court instructed:

A person is legally responsible for the conduct of another person
when, either before or during the commission of the offense, and
with intent to promote or facilitate the commission of the
offense, he knowingly solicits, aids, abets, agrees to aid, or
attempts to aid the other person in the planning or commission
of the offense.

A person who is legally responsible for the conduct of another
may be convicted for the offense committed by the other person
even though the other person, who it is claimed committed the
offense, has not been prosecuted or has not been convicted.

Id. at 107.  The judge also instructed the jury based on the principal theory of guilt.

C.    Appeal

Petitioner appealed his conviction and sentence.  He argued that:

(1)    the trial court erroneously allowed Mary Russo to testify in violation of the Illinois marital privilege;

(2)    he was convicted on insufficient evidence;

(3)    the trial court should have granted him a substitution of judge based on the judge's involvement in Mary Russo's sentencing; and

(4)    he was entitled to an additional day of credit against his sentence.

The appellate court rejected his arguments and affirmed.

Petitioner then filed a petition for leave to appeal (PLA) in the Illinois Supreme Court.  He argued that:

(1)    the trial court erroneously allowed Mary Russo to testify in violation of the Illinois marital privilege;

(2)    he was convicted on insufficient evidence;

(3)    the State committed prosecutorial misconduct by improperly

referring to him as a "butcher" in closing argument and telling jurors that only they could prevent a killer from walking out of the room;

(4)   the State did not prove his guilt under an accountability theory;

(5)   the trial court should have granted him a substitution of judge based on the judge's involvement in Mary Russo's sentencing;

(6)   his appellate counsel provided ineffective assistance for failing to raise claims of prosecutorial misconduct;

(7)   the hammer and saw were improperly introduced and admitted given that no DNA evidence linked them to the murder;

(8)   by calling an expert to testify in latent fingerprints forensic science despite the fact that there were no fingerprints recovered in this case, the State improperly suggested that Petitioner wiped away prints on the hammer and saw;

(9)   Kim Gooding and Lenora Hogan offered inadmissible hearsay testimony;

(10)   the trial court should have continued the trial until the Heathers could be located;

(11)   the State committed prosecutorial misconduct by offering DNA

evidence regarding Terry Hawe, and the trial court improperly

admitted it; and

(12) the State committed prosecutorial misconduct by cross-

examining Petitioner in an overly-aggressive manner.

The Illinois Supreme Court denied Petitioner leave to appeal on December

16, 2004.

D.   <u>Post-Conviction</u>

Petitioner also pursued post-conviction remedies.   On January 12,

2005, Petitioner filed a pro se petition for post-conviction relief in the

Illinois trial court.   His pro se petition alleged that:

(1)   appellate counsel provided ineffective assistance;

(2)   given that no DNA evidence linked the hammer and saw to the

murder, the State committed prosecutorial misconduct by

offering them into evidence, and the trial court improperly

admitted them;

(3)   the State committed prosecutorial misconduct by offering DNA

evidence regarding Terry Hawe;

(4)   by calling an expert to testify in latent fingerprints forensic

science despite the fact that there were no fingerprints recovered

in this case, the State improperly suggested that Petitioner wiped away prints on the hammer and saw;

(5)    the State committed prosecutorial misconduct by offering hearsay testimony from Gooding and Hogan, and the trial court improperly admitted such testimony;

(6)    the State committed prosecutorial misconduct by cross-examining Petitioner in an overly aggressive manner;

(7)    the State committed prosecutorial misconduct in closing argument by referring to Petitioner as a butcher, accusing him of lying, and asking the jury to protect the community by convicting Petitioner, and the trial court improperly allowed such;

(8)    the trial court should have continued the trial until the Heathers could be located;

(9)    the trial judge made remarks critical of the Illinois statute regarding marital privilege, and his remarks demonstrate favoritism;

(10)  the trial court failed to instruct the jury to assess impeachment evidence properly;

(11)  Petitioner was actually innocent, as newly discovered evidence

demonstrates; and

(12)  Illinois' accountability statute was unconstitutional on its face

and as applied to Petitioner.

Petitioner also requested counsel.  The court appointed his trial attorney,

and the attorney filed an amended petition confining the post-conviction

issues to four arguments: (1) that appellate counsel provided ineffective

assistance; (2) that the State committed misconduct in closing argument;

(3) that Illinois' accountability statute was unconstitutional on its face and

as applied to Petitioner; and (4) that Petitioner was actually innocent.  The

trial court dismissed Petitioner's Amended Petition.

Raising only a post-conviction ineffective assistance of counsel claim,

Petitioner appealed the dismissal.[2]  The appellate court affirmed, holding

that post-conviction counsel provided reasonable assistance.  The appellate

---

[2]Petitioner insists that he advanced more than a post-conviction ineffective assistance of counsel claim.  In his Traverse to Respondent's Answer to Petition for Writ of Habeas Corpus (d/e 21) (Traverse), he states that "many more issues were either visited or raised by the appellate court." Traverse, at 18.  As discussed in Part II.E.1, the appellate court did address two claims of ineffective assistance of counsel on direct appeal, but Petitioner's brief before the appellate court did not raise those claims.  It argued only that "defendant was denied a reasonable level of assistance on his post-conviction petition where trial counsel was appointed to represent defendant on that petition." Response, Exhibit X, Brief and Argument for Defendant-Appellant, at 5.

court also addressed the representation Petitioner received from his counsel on direct appeal and held that in his amended post-conviction petition, Petitioner failed to allege a substantial denial of a constitutional right.

Petitioner then appealed to the Illinois Supreme Court.  Petitioner attempted to file a pro se PLA raising 13 claims.  He argued that:

(1)    the hammer and saw were improperly introduced and admitted given that no DNA evidence linked them to the murder;

(2)    Gooding and Hogan offered inadmissible hearsay testimony;

(3)    the trial court should have continued the trial until the Heathers could be located;

(4)    the trial court should not have admitted DNA evidence regarding Terry Hawe;

(5)    the State committed misconduct at trial by advising Shoop and Conover, Jr. that they could exercise their Fifth Amendment right not to testify in the offer of proof inquiry regarding the Heathers' statements (though they did in fact testify);

(6)    the State committed misconduct in closing argument;

(7)    the State's cross-examination of Petitioner was overly aggressive;

(8)    the trial court failed to instruct the jury to assess impeachment

evidence properly;

(9)  the trial court violated Petitioner's constitutional rights by expressing personal disagreement with the Illinois marital privilege law;

(10)  Petitioner was actually innocent, as newly discovered evidence demonstrates;

(11)  Illinois' accountability statute was unconstitutional on its face and as applied to Petitioner;

(12)  appellate counsel provided ineffective assistance; and

(13)  post-conviction counsel provided ineffective assistance of counsel.

Subsequently, however, Petitioner's attorney filed a PLA raising only the post-conviction ineffective assistance claim.  After receiving Petitioner's attorney's PLA, the Illinois Supreme Court held that the pro se submission could not be filed because the Illinois Supreme Court Rules do not allow a party to file a second PLA from the same appellate court disposition. Petitioner asked the Illinois Supreme Court to strike the PLA filed by his attorney and consider his pro se PLA instead, but the court denied his motion.  On November 29, 2007, the court then denied leave to appeal as

well; its mandate issued January 4, 2008.

ANALYSIS

In his Petition before this Court, Petitioner has raised numerous claims.  He argues that:

(1)  the State committed prosecutorial misconduct by introducing the hammer and saw given that no DNA evidence linked them to the murder;

(2)  the State committed prosecutorial misconduct by eliciting inadmissible hearsay testimony from Gooding and Hogan;

(3)  the State committed prosecutorial misconduct by introducing DNA evidence regarding Terry Hawe;

(4)  the State committed prosecutorial misconduct by advising Shoop and Conover, Jr. that they could exercise their Fifth Amendment right not to testify in the offer of proof inquiry regarding the Heathers' statements;

(5)  the State committed prosecutorial misconduct in closing argument;

(6)  the State committed prosecutorial misconduct by cross-examining Petitioner in an overly aggressive manner;

(7)     the trial court should have granted his motion for substitution of judge;

(8)     the trial court violated Petitioner's constitutional rights by expressing personal disagreement with the Illinois marital privilege law;

(9)     the trial court should have excluded statements made by Petitioner to his wife;

(10)   the trial court failed to instruct the jury to assess impeachment evidence properly;

(11)   the trial court should have continued the trial until the Heathers could be located;

(12)   Petitioner was convicted on insufficient evidence;

(13)   Illinois' accountability statute was unconstitutional on its face and as applied to Petitioner;

(14)   Petitioner was actually innocent, as newly discovered evidence demonstrates;

(15)   appellate counsel provided ineffective assistance; and

(16)   post-conviction counsel provided ineffective assistance.

Contemporaneous with his Petition, Petitioner filed a Motion for

Production of Pre-Trial Discovery Documents.  Before taking up Petitioner's arguments for habeas corpus, the Court will address this Motion.  Then the Court will discuss related issues in the Petition together, following the organization Respondent employed in his Response.  Thus, in addressing the Petition, the Court will first address the general law applicable to § 2254 habeas cases, which mandates a denial of Petitioner's Motion for De Novo Review.  Second, the Court will analyze Petitioner's claims of pretrial error.  Third, the Court will consider Petitioner's allegations of error at trial, including prosecutorial misconduct.  Fourth, the Court will discuss Petitioner's claims regarding actual innocence and sufficiency of the evidence.  Fifth, the Court will address Petitioner's allegations of ineffective assistance of counsel.

I.    MOTION FOR DISCOVERY

Petitioner is not entitled to discovery in this action.  He asserts that without police investigative reports, recorded statements by potential witnesses, affidavits from the Heathers, and Mary Russo's sentencing hearing transcript, Petitioner's efforts for habeas relief "will not be meaningful, effective or adequate."  Motion for Production of Pre-Trial Documents, at 3.  The broad rules governing discovery in most civil cases

do not apply in habeas cases.  <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997).

Rule 6(a) of the Rules Governing § 2254 Cases allows a petitioner to request

discovery, but such requests are granted only for "good cause shown," and

only in the judge's discretion.  <u>Id.</u>

 To establish good cause, Petitioner must show that "specific

allegations before the court show reason to believe that the petitioner may,

if the facts are fully developed, be able to demonstrate that he is . . . entitled

to relief."  <u>Id.</u> at 908-09.  He has not done so.  Preliminarily, Petitioner has

not demonstrated that the extra-record documents he seeks even exist.  If

they do, he argues only that they are relevant to his claim of actual

innocence.  As discussed in Part II.D.2, a freestanding claim of actual

innocence is not cognizable in a § 2254 case.  <u>Herrera v. Collins</u>, 506 U.S.

390, 398 (1993).

 Moreover, even if these documents do exist and are relevant to a claim

on which Petitioner may be entitled to relief, he has not established that

this evidence would be admissible at an evidentiary hearing.  "Requests for

discovery in habeas proceedings normally follow the granting of an

evidentiary hearing."  Rule 6 of the Rules Governing § 2254 Cases comm.

notes (1976).  To obtain a hearing, Petitioner must demonstrate that one

of his claims relies on a factual predicate that could not have been discovered previously through the exercise of due diligence.  28 U.S.C. § 2254(e)(2).  He has not even argued that the documents he requests could not have been obtained before or during trial.

Petitioner has not shown good cause.  Thus, the Motion for Production of Pre-Trial Discovery Documents is denied.

II.  <u>THE PETITION</u>

The Petition also is denied.  Relying on the law governing § 2254 cases, set forth in Part II.A, the Court finds that none of Petitioner's claims justify the issuance of a writ of habeas corpus.  As set forth in Part II.B, Petitioner's pretrial error claims are not cognizable or lack merit.  In Part II.C, the Court concludes that all of Petitioner's trial error claims are procedurally defaulted.  The analysis in Part II.D establishes that his claims of innocence lack merit or are not cognizable.  Finally, Petitioner's claims of ineffective assistance of counsel discussed in Part II.E are procedurally defaulted, lack merit, or are not cognizable.

A.  <u>Standards Applicable in § 2254 Habeas Cases</u>

This Court may issue a writ of habeas corpus to a state official only if the state court decision denying a petitioner's claims was:  (1) contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  If the state court identified the correct rule of law, then this Court will deny the habeas petition unless the state court's application of the law was not minimally consistent with the facts and circumstances of the case.  <u>Sweeney v. Parke</u>, 113 F.3d 716, 718 (7th Cir. 1997).

The first requirement makes it impossible for a federal court to grant a petitioner's application for habeas based on an error in application of state law.  The Supreme Court has emphasized that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  State law violations provide no basis for habeas relief.  <u>Id.</u> at 68; <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).

Moreover, in reviewing a state court's application of federal law, this Court must employ a "highly deferential standard."  <u>Woodford v. Visciotti</u>,

537 U.S. 19, 24 (2002).  A federal court may not confer habeas relief merely because it disagrees with a state court's decision; federal courts may intervene only when a state court judgment "is objectively unreasonable." Id. at 20, 27.  As long as a state court decision is not "contrary to" United States Supreme Court precedent or premised on an "unreasonable determination of the facts," it is not objectively unreasonable.  28 U.S.C. § 2254(d)(1)-(2).

In considering the second requirement -- whether a state court decision was based on an unreasonable determination of the facts -- this Court must presume that all factual findings by the state courts are correct. 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption, but only through clear and convincing evidence.  Id.

For these reasons, the Court cannot grant Petitioner's Motion for De Novo Review.  Petitioner argues that this Court must review the record "in light of its own independent judgment without giving special weight to the prior decisions of state reviewing courts."  Motion for De Novo Review, at 2.  As noted, United States Supreme Court precedent and federal statute prohibit the Court from doing so.  Therefore, Petitioner's Motion for De Novo Review is denied.

32

Petitioner also, however, urges the Court to decide his issues based solely on federal sources of law.  In that this Court will not determine whether the state courts were correct in their application of Illinois law, the Court will follow Petitioner's urging on this point.

Additionally, before a petitioner can convince a court that his case involves a decision contrary to United States Supreme Court precedent or an unreasonable application of law or factual determination, he must clear the default hurdle.  "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Bousley v. United States, 523 U.S. 614, 621 (1998) (internal quotation marks omitted).  Before obtaining a writ of habeas corpus in federal court, a petitioner must demonstrate that he fully and fairly presented all of his federal claims to the state court before seeking federal habeas relief.  Harris v. McAdory, 334 F.3d 665, 668 (7th Cir. 2003).  The petitioner must have raised his claim at each appropriate stage of the state review process, and at each stage, he must have alerted the state courts of its federal basis.  Perruquet v. Briley, 390 F.3d 505, 514 (7th Cir. 2004).  "[A] petitioner must give the state court a meaningful opportunity to consider the substance of the claims later presented in federal court." Harris, 334 F.3d at 668.  Failure to do so constitutes a

procedural default.

Where a petitioner defaulted his claims, a federal court cannot grant any relief on those claims, "unless the petitioner demonstrates cause for the default and actual prejudice as a result of the failure, or demonstrates that the failure to consider the claims will result in a fundamental miscarriage of justice." Harris, 334 F.3d at 668 (citing Dellinger v. Bowen, 301 F.3d 758, 764 (7th Cir. 2002)). Cause exists only where an external impediment blocked the petitioner from asserting his federal claim in state court. Murray v. Carrier, 477 U.S. 478, 488 (1986). A petitioner has been prejudiced only where the error claimed "worked to his actual and substantial disadvantage," infecting his entire trial or appellate proceeding with "error of constitutional dimensions;" an error that created the *possibility* of prejudice is not enough. United States v. Frady, 456 U.S. 152, 170 (1982). Finally, the fundamental miscarriage of justice exception applies only where the constitutional violation probably resulted in the conviction of a defendant who was "actually innocent." Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003).

B.      Pretrial Error Claims

Petitioner raised three claims of pretrial error: (1) that the trial court violated Petitioner's constitutional rights by expressing personal disagreement with the Illinois marital privilege law; (2) that the trial court should have excluded statements made by Petitioner to his wife; and (3) that the trial court should have granted Petitioner's motion for substitution of judge.  None provides grounds for federal habeas relief.

1.      Marital Privilege Issues

First, Petitioner objects to the admission of Mary Russo's testimony regarding two conversations.  While the trial court excluded Mary Russo's testimony regarding a conversation in which she says Petitioner admitted murdering Smith, it held that the Illinois marital privilege did not apply to two earlier conversations and admitted them.  The admissibility of Mary Russo's testimony under the Illinois marital privilege doctrine was an evidentiary issue involving only state law.  See 725 ILCS 5/115-16 (the Illinois marital privilege statute).  Petitioner argues that the state courts "did not once make it clear that they were resting their decision denying relief on an independent and adequate state ground."  See Traverse, at 8. The transcript of the hearing on his motion to exclude Mary Russo's testimony

35

belies his argument, however.  <u>See</u> <u>Response</u>, Exhibit 7, <u>Hearing Transcript</u>, at 15, 18, 33, 38 (referencing the Illinois marital privilege statute, as opposed to the federal rule of evidence).

This Court may not consider the propriety of Illinois court decisions based on Illinois evidentiary law, except to decide whether they violated federal constitutional law.  <u>United States ex. rel. Harris v. Illinois</u>, 457 F.2d 191, 198 (7th Cir. 1972).  Generally, issues of state evidentiary law do not.  <u>See, e.g.</u>, <u>Martin v. Evans</u>, 384 F.3d 848, 855 (7th Cir. 2004).  Specifically, numerous courts have concluded that a violation of a state marital privilege law does not create a constitutional error.  <u>See, e.g.</u>, <u>Nance v. Nelson</u>, 60 F.3d 837, 1995 WL 380803, at *8 (10th Cir. June 21, 1995); <u>Byrd v. Armontrout</u>, 880 F.2d 1, 9 (8th Cir. 1989); <u>Port v. Heard</u>, 764 F.2d 423, 430 (5th Cir. 1985)<u>; United States v. Lefkowitz</u>, 618 F.2d 1313, 1319 (9th Cir. 1980); <u>United States v. Doe</u>, 478 F.2d 194, 195 (1st Cir. 1973).  Thus, Petitioner's claim is not cognizable here.

Second, Petitioner takes issue with the trial judge's statement, during the hearing on Petitioner's motion to exclude Mary Russo's testimony, that in the judge's view, even Mary Russo's testimony regarding Petitioner's alleged admission of murder should be admissible because "nobody should

be able to hide behind a so-called sanctity of a marriage when dastardly deeds are being discussed, and talked about and performed." Response, Exhibit F, Hearing Transcript, at 33.  According to Petitioner, the trial judge's statement:

> exhibited personal and/or extrajudicial reasoning that displayed "pervasive bias" towards the constitutional protections of marital privilege.  Said remarks were not derived from the evidence or conduct of parties the judge observed "during" the course of petitioner's . . . trial.  It was extrajudicial bias held "before" petitioner's trial began.  This constitutes judicial error that, when quantitatively assessed, infected the framework of defensive evidence presented by petitioner . . . .

Petition, at 12-13.

Petitioner's claim does not support the issuance of a writ of habeas corpus.  While the judge expressed personal disagreement with the Illinois privilege statute that mandated exclusion of Mary Russo's testimony regarding Petitioner's alleged admission of murder, he followed it and prohibited her testimony regarding that third conversation.  Presumably, Petitioner does not object to that ruling.  To what he does object is unclear.  In his PLA before the Illinois Supreme Court, Petitioner quoted this same statement by the trial judge when arguing that the court should have

granted his motion for substitution.[3]   <u>Response</u>, Exhibit T, <u>PLA</u>, at 5.

Petitioner has not articulated how the judge's decision to exclude Mary

Russo's testimony regarding Petitioner's admission might relate to

Petitioner's motion to substitute.   Petitioner's argument is unreasonably

vague and confusing, which alone provides grounds for this Court to dismiss

it.   <u>See</u> <u>Oliver v. United States</u>, 961 F.2d 1339, 1343 (7th Cir. 1992).

Moreover, Petitioner fails to argue that the trial judge's statements violated

any federal or constitutional law, and the Court can discern no violation.

Petitioner has established no basis for concluding that the trial court's

statements entitle him to habeas relief.

2.   <u>Substitution of Judge</u>

Petitioner's argument that he was entitled to a substitution of judge

after the judge advised his wife to testify truthfully also fails to establish a

right to habeas relief.   The Due Process Clause of the Fourteenth

Amendment "clearly requires a fair trial in a fair tribunal, before a judge

with no actual bias against the defendant or interest in the outcome of his

particular case." <u>Bracy</u>, 520 U.S. at 904-05 (internal quotation marks and

---

[3]The Court can find no discussion of this statement in Petitioner's arguments
before the Illinois appellate court, making it likely Petitioner defaulted on this claim.

citations omitted). Where a judge cannot "hold the balance nice, clear, and true between the state and the accused," he is actually biased. <u>Taylor v. Hayes</u>, 418 U.S. 488, 501 (1974).

Here, the Illinois courts ruled that the trial court did not exhibit actual bias, and this Court must afford that decision some deference. A federal court may only find for a habeas petitioner if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or if it was based on an unreasonable determination of fact. 28 U.S.C. § 2254(d)(1). The Illinois courts' decisions here were neither.

As the Illinois appellate court noted, the trial judge required Mary Russo only to testify truthfully; he put no pressure on her to say anything in particular, or to favor any party with her testimony. In this Court's view, the trial judge's admonishment reveals nothing about his ability to keep the "balance nice, clear, and true between the state and the accused." <u>Taylor</u>, 418 U.S. at 501. Moreover, the judge averred that he advised all probationers who appeared before him to testify truthfully in criminal cases, thus, the fact that he so advised Mary Russo fails even to demonstrate a particular interest in Petitioner's case.

In contrast, the provision in Mary Russo's sentencing order indicating

that she might be released for treatment after testifying in Petitioner's trial apparently was unusual, but in his affidavit, the trial judge stated that he did not realize Mary Russo's attorney had inserted such language.  Once the mistake came to his attention, he corrected it.  In fact, the judge did so before Mary Russo testified, so even had she been under the mistaken impression that her testimony might affect her incarceration, the trial judge insured that she knew better before Petitioner's trial began.  Again, this Court sees nothing in these events suggesting that the trial judge was biased against Petitioner.  The state courts' decisions were not contrary to clearly established federal law.

The inquiry does not end at actual bias, however.  Petitioner is correct that Due Process also requires that a defendant be tried free of "an appearance of bias."  Taylor, 418 U.S. at 501.  While Petitioner never argued in the state courts that the federal constitution guaranteed him a right to trial free of the appearance of bias, the Illinois appellate court nonetheless noted, "We fail to see how Judge Cashman's order to Mary Russo that she testify truthfully amounts to the appearance of impropriety." Petition, at 50.  This holding also is entitled to deference.  See Early v. Packer, 537 U.S. 3, 8 (2002) (noting that state courts need not discuss

applicable constitutional law so long as they do not contradict it); <u>Harrison v. McBride</u>, 428 F.3d 652, 656 (7th Cir. 2005).  Moreover, this Court agrees with it.  The trial court's requirement that Mary Russo testify truthfully and its sentencing order noting the possibility of release after Petitioner's trial, which was corrected before his trial, failed to create even the appearance that the judge might favor the State at trial.

Thus, Petitioner's substitution of judge argument does not establish grounds for habeas relief.  Because Petitioner's argument fails on the merits, the Court need not address the complicated procedural history of his claim to determine whether he defaulted it.

C.    <u>Trial Error Claims</u>

Petitioner has raised nine claims of trial error.  Specifically, he alleges:

(1)    the State committed prosecutorial misconduct by introducing the hammer and saw given that no DNA evidence linked them to the murder;

(2)    the State committed prosecutorial misconduct by eliciting inadmissible hearsay testimony from Gooding and Hogan;

(3)    the State committed prosecutorial misconduct by introducing DNA evidence regarding Terry Hawe;

(4)    the State committed prosecutorial misconduct by advising Shoop and Conover, Jr. that they could exercise their Fifth Amendment right not to testify in the offer of proof inquiry regarding the Heathers' statements;

(5)    the State committed prosecutorial misconduct in closing argument;

(6)    the State committed prosecutorial misconduct by cross-examining Petitioner in an overly aggressive manner;

(7)    the trial court failed to instruct the jury to assess impeachment evidence properly;

(8)    the trial court should have continued the trial until the Heathers could be located; and

(9)    Illinois' accountability statute was unconstitutional on its face and as applied to Petitioner.

All of these claims were procedurally defaulted, and Petitioner has not overcome the hurdle of default.

To obtain habeas relief, a petitioner must demonstrate that he fully and fairly presented all of his federal claims to the state court before seeking federal habeas relief.  Harris, 334 F.3d at 668.  The petitioner must have

raised his claim at each stage of the state review process, and at each stage, he must have alerted the state courts of its federal basis.  Perruquet, 390 F.3d at 514.  Asserting that counsel was ineffective for failing to raise a particular error does not constitute fully and fairly presenting the underlying claim of error.  Lewis v. Sternes, 390 F.3d 1019, 1026 (7th Cir. 2004).

Petitioner presented none of these claims of trial error in his initial appeal to the Illinois appellate court.  In Illinois, claims that could have been raised on direct appeal but are not generally are deemed forfeited.  See, e.g., Illinois v. Blair, 831 N.E.2d 604, 614-15 (Ill. 2005); Illinois v. Harris, 794 N.E.2d 314, 323 (Ill. 2002).  Because all of Petitioner's trial error claims could have been raised, Petitioner failed to fairly present them to the state court.  In his PLA before the Illinois Supreme Court, Petitioner asserted that appellate counsel's failure to present many of these issues on direct appeal was ineffective assistance of counsel.  That claim, however, does not preserve the underlying claims of error.  Lewis, 390 F.3d at 1026. His ineffective assistance of appellate counsel claim is only relevant for determining whether he had cause for defaulting.

Petitioner had one last possibility of preserving his nine claims of trial error, but again, he failed to take advantage of this opportunity.  Where a

petitioner raises an otherwise defaulted claim on post-conviction review and the state courts resolve that claim on the merits, the procedural default doctrine will not bar consideration of his claim in a habeas proceeding. Perry v. McCaughtrey, 308 F.3d 682, 691-92 (7th Cir. 2002); see also Gomez, 350 F.3d at 677 (holding that where a state court declines to review a claim not properly raised, the state court's decision relies on state grounds both independent of the federal question and adequate to support the judgment).

In his pro se petition for post-conviction relief before the Illinois trial court, Petitioner raised seven of his trial error claims.  The trial court then appointed counsel, and his attorney filed an amended petition that included just two of the trial error claims -- that the State committed prosecutorial misconduct in its closing argument and that Illinois' accountability statute was unconstitutional.[4]  At the time, Petitioner did not inform the court of any objection to his attorney's amended petition.  His failure to raise the

---

[4]The amended petition also alleged that appellate counsel provided ineffective assistance in failing to challenge the trial court's refusal to grant a continuance until the Heathers could be located.  In addressing this claim, the court included significant analysis of the merits of the underlying continuance claim.  This Court need not decide whether such treatment sufficed to revive the underlying continuance claim because the claim was procedurally defaulted when Petitioner neglected to include the issue in his appeal of his post-conviction dismissal.

other seven claims of trial error cemented their procedural default, but because the Illinois court did address the merits of his claims regarding closing argument and the Illinois accountability statute, those claims became viable again.

In subsequent stages, however, Petitioner re-defaulted these claims. In his appeal of the trial court's dismissal of his post-conviction case, Petitioner argued only that his post-conviction counsel was ineffective. He argued that his attorney had been ineffective for not raising several of the trial errors at issue here, but again, raising an ineffective assistance of counsel claim does not preserve the underlying claims. Lewis, 390 F.3d at 1026. After the appellate court dismissed his post-conviction appeal, Petitioner's attorney filed a PLA before the Illinois Supreme Court raising only the claim of ineffective assistance of post-conviction counsel. Petitioner attempted to file a pro se PLA raising all of his trial error claims, but the Illinois Supreme Court refused to consider his pro se PLA.

Had Petitioner not re-defaulted at the appellate post-conviction stage on his two viable underlying claims of trial error, it is possible that his pro se PLA might have preserved these two issues for habeas review. See Holloway v. Horn, 355 F.3d 707, 715-16 (3$^d$ Cir. 2004); Dorsey v. Kelly,

112 F.3d 50, 52 (2d Cir. 1997); <u>Clemmons v. Delo</u>, 124 F.3d 944, 947-48 (8th Cir. 1997); <u>McBride v. Estelle</u>, 507 F.2d 903, 904 (5th Cir. 1975).  By failing to raise these issues before the appellate court, however, Petitioner failed to provide *each* of the state courts a fair opportunity to consider his claims.  Again, his claims of ineffective assistance of counsel do not preserve the underlying claims of error.  <u>Lewis</u>, 390 F.3d at 1026.  Thus, Petitioner's nine claims of trial error are procedurally defaulted.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991) (noting that regardless of the decision of the last state court to which a petitioner presented his claims, if the petitioner failed to exhaust state remedies on that claim and would now be procedurally barred from doing so, his claims are procedurally defaulted).

Moreover, Petitioner cannot overcome the default.  Where a petitioner failed to afford the state courts a full round of review, a federal court cannot grant any relief on his claims unless the petitioner demonstrates: (1) cause and actual prejudice or (2) that the failure to consider his claims will result in a fundamental miscarriage of justice because the petitioner is actually innocent.  <u>Harris</u>, 334 F.3d at 668.  Here, Petitioner has demonstrated neither.

First, he has not established cause.  Petitioner asserts that his

attorneys' ineffective assistance caused his procedural defaults.  Attorney error can constitute cause for a default.  Lewis, 390 F.3d at 1026.  Yet, that attorney error must rise to the level of constitutionally ineffective assistance of counsel.  Murray, 477 U.S. at 488.  Plus, a claim for ineffectiveness itself must have been fairly presented to the state courts before it can establish cause for procedural default of another claim.  Edwards v. Carpenter, 529 U.S. 446, 452-54 (2000).

In Part II.E.1, the Court holds that Petitioner procedurally defaulted most of his claims of appellate ineffective assistance of counsel, and those claims that he did not default are without merit.  Thus, he cannot use appellate counsel ineffectiveness to establish cause for failing to raise his trial errors.  See id. at 453; Murray, 477 U.S. at 488.  Further, in Part II.E.2, the Court holds that Petitioner had no constitutional right to representation in post-conviction proceedings.  Thus, even if his post-conviction counsel provided ineffective assistance, he could not use it to establish cause for failing to raise his trial errors.  See Coleman, 501 U.S. at 752.

Without the existence of cause, the possibility of prejudice is irrelevant in assessing whether to consider a procedurally defaulted claim.  Thus, the

Court need not consider whether any of the alleged trial errors prejudiced Petitioner.

Second, Petitioner cannot succeed under his only remaining method of overcoming his procedural default because he has not established actual innocence.  In the default context, actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  Schlup v. Delo, 513 U.S. 298, 315 (1995) (omitting internal quotation marks).  Where a petitioner who defaulted on a claim of constitutional error presents such significant evidence of actual innocence that a court cannot be confident in his conviction unless it also is satisfied that no harmful constitutional error marred the trial, "the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."  Id. at 316.  "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."  Bousley, 523 U.S. at 623.

To establish actual innocence, Petitioner must show that in light of all of the evidence, it is more likely than not that no reasonable juror would have convicted him.  Schlup, 513 U.S. at 327-28.  Moreover, to advance

such a claim, Petitioner must present "*new* reliable evidence" of his innocence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." Id. at 324 (emphasis added).

Petitioner has not done so. Petitioner has presented no new exculpatory scientific or physical evidence. While he submits Adam Heather's account of a conversation he claims he had with Conover, Jr., Adam Heather's 2002 account is inconsistent with his statements to the parties during trial. For example, in 2002, Adam Heather mentioned only one conversation, while during trial, he discussed two. He also varied on the date his conversation or conversations supposedly occurred. During trial, the other witnesses who supposedly were present for the conversation at Conover, Sr.'s apartment denied that it took place. Conover, Jr. denied any knowledge of the murder. Additionally, Adam Heather refused to provide a sworn statement; the transcript Petitioner submitted records only an informal interview between Adam Heather and Petitioner's private investigator. Moreover, Adam Heather did not state that he witnessed the murder; he only recounted subsequent conversations about it. Thus, the transcript of the informal interview of Adam Heather does not constitute a trustworthy eyewitness account.

As new evidence, Petitioner also submits an affidavit, dated October 4, 2004, from a Johnny R. Presley, but this affidavit is even less probative of Petitioner's innocence because it contains no information regarding the events of March 2001.  See Petition, at 87.  Presley avers that in 1983, he dated Shoop's daughter and heard Shoop say that if Dale Smith ever made it out of prison, he would kill him and cut him into pieces.  Presley makes no allegation regarding the circumstances of Smith's actual death in 2001.

Thus, the new evidence Petitioner submits does not support an actual innocence claim.  Even considering this evidence, a reasonable juror could have relied upon the conflicting testimony from Roberts, the Conovers, and Mary Russo to conclude that Adam Heather's testimony was false. Moreover, a reasonable juror also could consider Presley's testimony and conclude that even if Shoop had threatened Smith in 1983, the evidence did not support a finding that Shoop killed him 18 years later.  Petitioner fails to show that it is more likely than not that a reasonable juror considering all the evidence, including Adam Heather's and Presley's statements, would have found him not guilty.

D.   Claims of Innocence

In two freestanding claims, Petitioner contests the jury's adjudication

of his guilt.   First, he contends that he was convicted on insufficient evidence, and second, he argues that newly discovered evidence demonstrates that he is actually innocent.   Neither claim affords him relief.

1.   Sufficiency of the Evidence

At each stage of his direct appeal, Petitioner argued that the evidence admitted against him was insufficient for conviction.[5]   Because the state courts employed the correct rule of law and their application was at least minimally consistent with the facts and circumstances of the case, this Court cannot grant Petitioner's request.   See Sweeney, 113 F.3d at 718.

In Jackson v. Virginia, the United States Supreme Court held that evidence is sufficient to support a criminal conviction if, viewing it in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. 307, 319 (1979); Johnson v. Bett, 349 F.3d 1030, 1034 (7th Cir. 2003).   The Illinois appellate court relied on this same standard in finding that the evidence against Petitioner was sufficient:

---

[5]Raising this claim at each stage of his direct appeal preserved the issue.   Because Petitioner preserved the issue on direct appeal, he was not required to raise it in post-conviction proceedings, and his failure to do so at each stage of the post-conviction process does not result in a procedural default.   See Castille v. Peoples, 489 U.S. 346, 350 (1989).

> When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  People v. Pollock, 780 N.E.2d 669, 685 (Ill. 2002).

Petition, at 44 (Illinois appellate court opinion).  Because the Illinois court identified the proper standard, the fact that the court cited to Illinois case law, as opposed to United States Supreme Court precedent, is irrelevant.  Early, 537 U.S. at 8  (holding that state courts need not even be aware of Supreme Court cases, so long as their reasoning and conclusions do not contradict them).

Moreover, the state court applied this standard reasonably.  It held:

> Circumstantial evidence can be sufficient to find a defendant guilty of first degree murder beyond a reasonable doubt.  A person commits first degree murder if he performs the acts that cause the death, and he either intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death to that person.  720 ILCS 5/9-1(a)(1) (West 2000).

> In the case sub judice, the State presented evidence that defendant suggested Smith spend the night at defendant's apartment on March 11, 2001.  Defendant was the last person seen with the heavily intoxicated Smith.  Mary Russo testified defendant told her he wanted to draw a guy away from Roberts so he could kill the man.  Russo also saw defendant with a meat cleaver in his back pocket.  Jerome Shoop testified defendant told him he killed Smith and wanted help rolling Smith in a rug and throwing him in a ravine.  Chuck Conover also testified

defendant asked him for help in carrying Smith's body over a hill or to a ravine.  Marlon Tournear saw Terry Hawe mopping the floor and washing the sidewalks outside of apartment No. 8 as well as dragging a couch outside.  Laura Tournear identified defendant as one of the men moving a couch.  Smith's blood was found on the couch by the Dumpster as well as in defendant's apartment.  Defendant stayed in a hotel for a few hours instead of his own apartment, hitchhiked out of town, and threw away his clothes, shoes, and identification.  In looking at all of the evidence, and when reviewing that evidence in the light most favorable to the State, we find a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

Petition, at 45-46 (Illinois appellate court opinion)(internal citations omitted).  Based on the evidence presented at trial, the state appellate court's application of clearly established federal law was reasonable.  Indeed, federal courts have rejected sufficiency arguments advanced by petitioners convicted on far less evidence.  See, e.g., McFowler v. Jaimet, 349 F.3d 436, 455 (7th Cir. 2003) (reversing a grant of habeas where a petitioner was convicted of murder based only on circumstantial evidence placing him at the scene of the crime generally and the testimony of one highly unreliable witness's testimony placing him next to the body with a gun).  A state court decision is only unreasonable for habeas purposes if its application of United States Supreme Court precedent lies "well outside the boundaries of permissible differences of opinion."  Id. at 447 (internal quotation marks

omitted).  The state court's opinion here does not.

The state appellate court also concluded that the facts were sufficient to convict Petitioner under an accountability theory, but even had this conclusion been unreasonable -- and this Court makes no such finding -- it does not impact the reasonableness of the state court's sufficiency analysis under the principal theory.  Thus, this Court need not address the evidence on accountability.

### 2.    Actual Innocence

Petitioner's second argument regarding his own guilt is even less persuasive.  Petitioner argues that newly discovered evidence proves that he is actually innocent, but a freestanding claim that newly discovered evidence is relevant to a petitioner's guilt is non-cognizable.  Townsend v. Sain, 372 U.S. 293, 317 (1963) (noting that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus"), overruled on other grounds, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).  "[F]ederal habeas corpus courts sit to ensure that individuals are not imprisoned in violation of the Constitution -- not to correct errors of fact."  Herrera, 506 U.S. at 400.

An allegation that newly discovered evidence establishes actual

innocence is grounds for habeas relief only when coupled with an allegation that a constitutional violation *regarding the new evidence* occurred in the state proceeding.  Id.  For example, an allegation that the prosecution improperly withheld this evidence or that counsel was ineffective for not discovering it might allow a habeas court to consider the newly discovered evidence.  See Moore v. Casperson, 345 F.3d 474, 491-93 (7th Cir. 2003).  Petitioner makes no such allegation here.

Moreover, as discussed in Part II.C, Petitioner's new evidence, in combination with all of the other evidence, does not establish actual innocence.  Thus, Petitioner's argument of actual innocence provides no grounds for relief.

E.   Ineffective Assistance of Counsel Claims

Petitioner alleges two separate claims of ineffective assistance of counsel.  First, he argues that his counsel on direct appeal provided ineffective assistance by failing to argue that:

(1)   trial counsel provided ineffective assistance;

(2)   the State committed six discrete instances of prosecutorial misconduct;

(3)   the trial judge was biased;

(4)    the trial court improperly refused to provide an instruction;

(5)    the trial court improperly denied a continuance;

(6)    the Illinois accountability statute was unconstitutionally applied against him; and

(7)    newly discovered evidence demonstrated his innocence.

Second, Petitioner argues that the counsel he received at the post-conviction stage was constitutionally ineffective because his trial attorney represented him on post-conviction, and his trial attorney failed to argue that he previously had failed to provide effective assistance of counsel at the trial stage.  Notably, while Petitioner describes his appellate and post-conviction attorneys' failure to argue ineffective assistance of trial counsel as ineffective assistance, Petitioner has *not* raised a separate claim of ineffective assistance of counsel at the trial stage.[6]  The Court will address Petitioner's appellate claim first and then take up his post-conviction claim.

### 1.    Appellate Counsel

Petitioner defaulted his allegation of ineffective assistance of appellate counsel.  In Illinois, a petitioner must pursue a claim of ineffective assistance

---

[6]Petitioner never raised a separate claim of ineffective assistance of trial counsel in any of his state court proceedings.  Thus, even if he had raised it here, it would have been procedurally defaulted.

of appellate counsel in post-conviction proceedings to avoid procedural default. Lemons v. O'Sullivan, 54 F.3d 357, 360-61 (7th Cir. 1995); United States ex. rel Eagle v. Gramley, 1999 WL 286086, at *4 (N.D. Ill. Apr. 27, 1999). This is an exception to the general rule that a petitioner who raises a claim at every possible stage of direct appeal need not reassert it in post-conviction proceedings. See Lemons, 54 F.3d at 360-61. Here, Petitioner raised a claim of ineffective assistance of appellate counsel in his PLA to the Illinois Supreme Court on direct appeal and in his petition for post-conviction relief, but on appeal of his post-conviction petition, he failed to argue ineffective assistance of appellate counsel. Thus, his claim procedurally defaulted. See United States ex rel. Redmond v. Scillia, 31 F.Supp.2d 1063, 1066 (N.D. Ill. 1998).

Fortunately for Petitioner, however, the appellate post-conviction court addressed the merits of two aspects of his ineffective assistance of appellate counsel claim despite the fact that he did not raise them. By resolving these claims on the merits, the appellate court thus revived them. See Perry, 308 F.3d at 691-92. Specifically, the appellate post-conviction court addressed Petitioner's claim that his counsel on direct appeal provided ineffective assistance by failing to argue that the State: (1) should not have

introduced the hammer and saw and (2) should not have told the jurors in closing argument that only they and the evidence could prevent a killer from walking out of the courtroom.  At this stage, while all of his other appellate counsel ineffectiveness arguments clearly had been defaulted, these two remained viable.

From there, though, the waters got muddy again.  In the pro se PLA Petitioner attempted to file with the Illinois Supreme Court, he argued these two claims, but in filing a PLA on Petitioner's behalf, his attorney did not. If Petitioner's attempt to file a pro se PLA preserved the two issues, they are not procedurally defaulted for this habeas proceeding; if only the PLA by his attorney suffices, they are.  The Seventh Circuit has not addressed this issue in a published opinion.  Relying on precedent from other circuits, this Court could conclude that Petitioner's pro se PLA preserved his two issues.  See Holloway, 355 F.3d at 715-16; Dorsey, 112 F.3d at 52; Clemmons, 124 F.3d at 947-48; McBride, 507 F.2d at 904.  In looking at the merits, however, it is clear that such a conclusion is unnecessary here.  Regardless of whether Petitioner defaulted on these two issues, on the merits they do not help him.

To prove ineffective assistance of counsel, Petitioner must show that

his attorney's representation was objectively deficient, and that the deficient representation caused him prejudice.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  "The failure of appellate counsel to raise an issue on appeal requires the court to compare the issue not raised in relation to the issues that were raised; if the issue that was not raised is 'both obvious and clearly stronger' than the issues raised, the appellate counsel's failure to raise the neglected issue is objectively deficient."  Sanders v. Cotton, 398 F.3d 572, 585 (7th Cir. 2005).

In its post-conviction opinion, the Illinois appellate court clearly identified this as the applicable law:

> A defendant who contends that appellate counsel rendered ineffective assistance, e.g., by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that the decision prejudiced the defendant. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal.

Petition, at 68 (Illinois post-conviction appellate opinion).  Where the state court identified the proper law, a federal court may not grant habeas relief unless the state court's application of that law was objectively unreasonable.

Woodford, 537 U.S. at 24.  Here, it was not.  The state court ruled that Petitioner's appellate attorney's failure to raise these two claims was not constitutionally ineffective because neither claim had merit.

Regarding the hammer and saw claim, the state court noted that weapons are admissible where some proof connects them to the crime, but that proof need only be the suitability of the weapons for commission of the crime.  Here, the State called two experts who testified that a hammer and saw could have caused the injuries Smith sustained.  Neither witness testified that the particular hammer or saw discovered in Petitioner's apartment actually did so, however, and another expert testified that neither weapon tested positive for blood.  Petitioner argued to the state court that this absence of evidence made the State's introduction of the hammer and saw improper.  The state court disagreed, holding that even when a weapon's connection to the defendant is tentative, the weapons are still admissible, so long as the defendant may probe the weakness of the connection.  Here, Petitioner did so: his attorney elicited the testimony regarding the lack of DNA evidence linking the weapons to the crime.  Thus, in the state court's view, the hammer and saw claim lacked merit.

The state court's decision was not unreasonable.  Indeed, this Court

agrees with it.  The jurors at Petitioner's trial knew that such a hammer and saw could have been the murder weapons, but they also knew that DNA evidence did not link these particular weapons to the murder.  The State's introduction of this evidence was not prosecutorial misconduct, and therefore it was not an "obvious" claim that should have been raised.  See Sanders, 398 F.3d at 585.

The state court's resolution of the closing argument claim also cannot be considered objectively unreasonable.  The United States Supreme Court has held that a prosecutor's comments in closing argument are grounds for reversal only if they deprive a defendant of a fair trial.  See Darden v. Wainwright, 477 U.S. 168, 180-81 (1986).  Whether or not a prosecutor's statements are so prejudicial depends on: (1) whether the prosecutor misstated the evidence; (2) whether the comments implicated a particular right afforded defendants; (3) whether the defense invited the comment; (4) the court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the comments.  Id. at 182.  The state court considered many of these factors in concluding that the prosecutor's comments did not deprive Petitioner of a fair trial:

In this case, the prosecutor's comments can be seen as an

> intention to persuade the jury that its decision based on the evidence would prevent defendant from committing further crimes.   Considering the nature of the evidence against defendant and the entire context of the prosecutor's closing arguments, we find defendant was not denied his right to a fair trial.   Moreover, the trial court instructed the jury that closing arguments were not evidence and arguments not based on the evidence were to be disregarded.

Petition, at 72-73 (Illinois appellate post-conviction opinion).  The other factors do not change the outcome.  On the one hand, the prosecutor made his comment during rebuttal argument, so the defendant had no opportunity to respond, and the Court sees no indication that the defense invited this particular comment.  On the other hand, the comment did not misstate the evidence and failed to implicate any particular right (such as the right not to testify).  The comment was not improper, and it did not deprive the Petitioner of a fair trial.  The state court's conclusion that this argument lacked merit and thus need not have been raised on appeal was not objectively unreasonable.  This argument provides no grounds for habeas relief.

## 2.   Post-Conviction Counsel

Finally, Petitioner's claim of ineffective assistance of counsel in post-conviction proceedings offers no grounds for relief.   Under 28 U.S.C. §

2254(I), "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." See also Johnson v. McBride, 381 F.3d 587, 590 (7th Cir. 2004) ("Once trial and direct appeals have run their course . . . neither the sixth amendment nor federal law guarantees effective assistance of counsel for collateral proceedings, not even in a capital case."). Thus, Petitioner's claim is not cognizable.

THEREFORE, the Motion for Production of Pre-Trial Discovery Documents (d/e 4), the Motion for De Novo Review (d/e 12), and the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (d/e 1-2) are DENIED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:  August 18, 2008

　　　　　FOR THE COURT:

　　　　　　　　　s/  Jeanne E. Scott
　　　　　　　　　JEANNE E. SCOTT
　　　　　　　UNITED STATES DISTRICT JUDGE

63